# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **ERIC J. DePAOLA,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:15cv00403 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **FRED SCHILLING,** *et al.*, | ) | |
| Defendants | ) | |

Plaintiff, Eric J. DePaola, ("DePaola"), is a Virginia Department of Corrections, ("VDOC"), inmate housed at Red Onion State Prison, ("Red Onion"), in Pound, Virginia. DePaola initiated this civil rights action pursuant to 42 U.S.C. § 1983 on July 19, 2015, against Dr. Everett McDuffie, ("Dr. McDuffie"), and Dr. Syed Ahsan, ("Dr. Ahsan"), and various VDOC employees alleging that the defendants were deliberately indifferent to his medical and mental health needs, in violation of his Eighth Amendment rights. (Docket Item No. 1.) On September 27, 2016, the Honorable James P. Jones, United States District Judge, issued an Opinion finding that DePaola failed to state a claim against the defendants and granted the defendants' motions to dismiss. (Docket Item Nos. 46, 47.) DePaola appealed to the United States Court of Appeals for the Fourth Circuit, (Docket Item No. 48), and the Fourth Circuit affirmed in part, reversed in part and remanded for further consideration of DePaola's claim that certain defendants[1] were deliberately indifferent to his mental health needs. (Docket Item No. 57.)

On remand, DePaola requested leave to amend to add additional unknown defendants. (Docket Item No. 80.) This court granted DePaola's motion and

---

[1] These defendants were Barksdale, Schilling, Fletcher, Dr. McDuffie, Huff and Trent.

instructed DePaola to identify the unknown defendants before September 1, 2018. (Docket Item No. 81.) DePaola filed his Amended Complaint on June 20, 2018. (Docket Item No. 82.) On August 3, 2018, defendant Dr. McDuffie filed a motion for summary judgment. (Docket Item No. 88.) On August 31, 2018, DePaola moved to add Dr. Ahsan as an additional defendant. (Docket Item No. 98.) On September 5, 2018, DePaola filed his Second Amended Complaint, naming Dr. Ahsan as a defendant. (Docket Item No. 103.) Dr. Ahsan moved to dismiss the Complaint for failing to state a claim on October 1, 2018. (Docket Item No. 113.)

This case is before the court on Dr. McDuffie's and Dr. Ahsan's motions, (collectively "Motions"). (Docket Item Nos. 88, 113.) The Motions are before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The Motions were heard before the undersigned on January 30, 2019. By Order entered that date, the court allowed the parties until March 1, 2019, to file any additional evidence they wanted the court to consider on the Motions. Those additional materials have been filed, and the matter is now ripe for disposition. The undersigned now submits the following report and recommended disposition.

## I.    Facts

By Complaint, filed July 19, 2015,[2] DePaola, then acting pro se, brought this 42 U.S.C. § 1983 action against numerous VDOC officials and Red Onion officials, doctors and nurses. (Docket Item No. 1.) In his Second Amended Complaint, (Docket Item No. 103), ("2nd Am. Compl."), filed September 5, 2018,[3]

---

[2]A pro se inmate's complaint is filed when an inmate delivers it to prison officials to mail to the court. *See Lewis v. Richmond City Police Dep't*, 947 F.2d 733, 735–36 (4th Cir. 1991).

[3] DePaola's Second Amended Complaint was filed by his current counsel.

DePaola stated that, since he was six years old, and up until his incarceration in 2004, he was diagnosed with various mental illnesses and received inpatient and outpatient mental health treatment. (2nd Am. Compl. at ¶¶ 23–25.) Additionally, DePaola stated, during his childhood and until his incarceration, he received psychiatric therapy and was prescribed medication for his mental health issues. (2nd Am. Compl. at ¶¶ 25–26.)

DePaola asserts that the VDOC had knowledge of his mental health issues. (2nd Am. Compl. at ¶ 27.) DePaola stated that a pre-trial, court-ordered psychological evaluation, as well as a post-conviction pre-sentencing report, ("PSR"), for the offenses for which he is currently incarcerated, documented his mental health history. (2nd Am. Compl. at ¶ 28.) The psychologist who performed the psychological evaluation found DePaola had a history of mental health treatment, likely suffered from bipolar disorder and should continue receiving mental health treatment. (2nd Am. Compl. at ¶ 29; Docket Item No. 96-4.) The PSR also stated that DePaola's mental health illnesses required treatment. (2nd Am. Compl. at ¶ 29.) However, the same psychologist who conducted the evaluation tested DePaola for malingering and found that DePaola "may be invested in having others think he is mentally ill." (Docket Item No. 96-4 at 4.)

DePaola alleges he notified VDOC officials that he previously had been diagnosed with mental illnesses and had a history of self-harming behavior when he entered the VDOC in 2004. (2nd Am. Compl. at ¶¶ 30–31.) DePaola stated that no local prison officials or employees provided him with treatment for his mental health issues. (2nd Am. Compl. at ¶ 32.) Additionally, DePaola stated VDOC provided him, upon entry, a mental health code of 1, which indicated that DePaola suffered from "at least some minimal mental health issues." (2nd Am. Compl. at ¶

31.) In 2007, DePaola was transferred to Red Onion. (2nd Am. Compl. at ¶ 33.) Red Onion subsequently assigned DePaola a mental health code of 0, which indicated that DePaola was no longer in need of mental health treatment. (2nd Am. Compl. at ¶ 58.) In 2009, DePaola, in a fit of "rage and impulsivity," which he claims was due to his untreated mental health issues, got into an "altercation" with a Red Onion guard, which resulted in Red Onion placing DePaola in restraints for three days. (2nd Am. Compl. at ¶ 35.) DePaola alleges that this "altercation" is what prompted Red Onion to place DePaola into solitary confinement. (2nd Am. Compl. at ¶ 37.)

DePaola admits Red Onion's Qualified Mental Health Professionals, ("QMHPs"), have conducted mental health inquiries concerning his well-being. (2nd Am. Compl. at ¶ 36.) DePaola alleges he has repeatedly notified Red Onion officials about his mental health issues, but he alleges he has received no medication or treatment. (2nd Am. Compl. at ¶ 48.) DePaola states he has not seen a psychiatrist since he was transferred to Red Onion. (2nd Am. Compl. at ¶ 34; Docket Item No. 96-3 at 4.) DePaola alleges no Red Onion "doctor-level mental health professional" has evaluated him. (2nd Am. Compl. at ¶ 34.) Moreover, DePaola states that neither Dr. McDuffie nor Dr. Ahsan has ever responded to any of DePaola's written or verbal requests for mental health treatment. (2nd Am. Compl. at ¶ 34.)

DePaola states he has repeatedly requested a mental health evaluation and mental health treatment from VDOC and Red Onion officials. (2nd Am. Compl. at ¶ 34.) DePaola states VDOC and Red Onion officials have not provided any treatment for his mental illnesses, despite him repeatedly notifying VDOC and Red Onion officials about his mental health issues. (2nd Am. Compl. at ¶ 32.) DePaola

stated he stopped receiving mental health treatment from his doctors when he entered the VDOC. (Docket Item No. 96-3 at 3.) DePaola stated that no Red Onion "psychiatrist, psychologist, or other doctor-level mental health professional" has ever visited, evaluated or responded to DePaola's written or verbal requests for mental health treatment. (2nd Am. Compl. at ¶ 34.) DePaola also alleges that "no VDOC or [Red Onion] mental health professional has ever comprehensively evaluated [DePaola's] mental health issues, and [DePaola] has never been provided any treatment whatsoever for his mental health issues." (2nd Am. Compl. at ¶ 34.)

On May 26, 2010, DePaola filed an emergency grievance, which stated he was suicidal. (2nd Am. Compl. at ¶ 42.) DePaola's emergency grievance stated he was having thoughts of self-harm; DePaola's thoughts included hanging himself or cutting himself. (Docket Item No. 89-1 at 13.) QMHP Ketron responded and placed DePaola in five-point restraints for 24 hours. (2nd Am. Compl. at ¶ 42; Docket Item No. 89-1 at 13.) DePaola states no VDOC or Red Onion mental health professional offered him any treatment after he conveyed thoughts of harming himself. (2nd Am. Compl. at ¶ 43.)

On May 27, 2010, QMHP Mullins asked DePaola about why he had been placed on suicide precautions. (Docket Item No. 89-1 at 12.) DePaola responded, "I just had some stuff going on in my life and got real upset yesterday." (Docket Item No. 89-1 at 12.) When QMHP Mullins inquired further, DePaola indicated he wanted to be "moved from the D4 pod," and stated "I just can't take it in that pod." (Docket Item No. 89-1 at 12.) When QMHP Mullins asked DePaola about his "suicide pact" with another inmate, DePaola stated, "[m]an, that was just a joke. I ain't trying to hurt myself." (Docket Item No. 89-1 at 12.) On May 27, 2010, QMHP Mullins wrote that she thought DePaola "was feigning suicidal ideations in

an attempt to be moved out of his assigned housing." (Docket Item No. 89-1 at 12.) When QMHP Mullins inquired further, DePaola "denied any homicidal, suicidal or self-injurious ideations." (Docket Item No. 89-1 at 12.)

For the 16 days following DePaola's meeting with QMHP Mullins, DePaola states, he attempted suicide by starving himself. (2nd Am. Compl. at ¶ 44.) On June 10, 2010, QMHP Ketron attempted to speak with DePaola, but DePaola would neither acknowledge nor respond to QMHP Ketron's questions. (Docket Item No. 96-11 at 2.) QMHP Ketron encouraged DePaola to drink water if he would not eat. (Docket Item No. 96-11 at 2.) DePaola states he began eating again after he was informed that he would be able to speak to the Red Onion psychiatrist at the time, Dr. Ahsan. (2nd Am. Compl. at ¶ 45.) DePaola states that he never saw Dr. Ahsan, Red Onion's psychiatrist at the time, or any other psychiatrist or psychologist, after he attempted suicide by starving himself. (2nd Am. Compl. at ¶ 45.) DePaola alleges that Dr. Ahsan had actual knowledge of his attempted suicide in 2010. (2nd Am. Compl. at ¶ 49.) DePaola states that the reason he believes that Dr. Ahsan knew of his suicide attempt was that he was told he would be able to speak to Dr. Ashan. (2nd Am. Compl. at ¶ 49.)

DePaola states he continues to suffer from serious mental health issues. (2nd Am. Compl. at ¶ 50.) Specifically, DePaola states he continues to have suicidal thoughts and suffers from depression. (2nd Am. Compl. at ¶ 50.) DePaola indicated these issues include extreme agitation, attention deficit hyperactivity disorder, ("ADHD"), depression, hopelessness, sleeplessness, hallucinations and psychomotor agitation. (2nd Am. Compl. at ¶ 53.) DePaola states he paces his cell until exhausted and in physical pain to due extreme agitation and hyperactivity. (2nd Am. Compl. at ¶ 53.) DePaola states he continues to suffer from panic

attacks, hallucinations, uncontrollable and rapid mood shifts, anxiety, paranoia and insomnia. (2nd Am. Compl. at ¶ 51.) DePaola states that he sits or lies in his bed for days at a time and contemplates harming himself. (2nd Am. Compl. at ¶ 53.) Additionally, DePaola states he suffers from night sweats, obsessive thoughts and continuous "states of tension and rage." (2nd Am. Compl. at ¶ 53.) DePaola states that the conditions of his confinement have negatively affected his mental health issues. (Docket Item No. 96-3 at 3.) DePaola states treatment would improve his mental health condition. (2nd Am. Compl. at ¶ 54.)

DePaola states that Dr. McDuffie "has never visited with me or even contacted me." (Docket Item No. 96-3 at 6.) Dr. McDuffie also states that he has neither treated nor evaluated DePaola and had "no knowledge of Plaintiff or his care" prior to DePaola filing the Complaint. (Docket Item No. 89 at 2.) Additionally, DePaola states, nobody at Red Onion has prescribed him any medications or provided any treatment for his mental health issues. (Docket Item No. 96-3 at 6.) DePaola asserted that he has "sought assistance from [Dr.] McDuffie for at least the past three or four years, but [Dr.] McDuffie has never visited [DePaola]." (2nd Am. Compl. at ¶ 55.) Also, DePaola states he has reached out to Dr. McDuffie verbally, when Dr. McDuffie has been near his cell, and in writing, including a written request utilizing a certificate of service, but he has not met with or been treated by Dr. McDuffie. (2nd Am. Compl. at ¶ 55.) DePaola alleges his verbal attempts to contact Dr. McDuffie consist of calling out to Dr. McDuffie whenever he is near DePaola's cell, telling Dr. McDuffie that he is "experiencing extreme psychological distress and needed help." (Docket Item No. 96-3 at 5.) DePaola alleges that Dr. McDuffie has responded "[N]ope" or "I don't make rounds." (Docket Item No. 96-3 at 5.)

Dr. McDuffie is a psychiatrist who provides contract services to the inmates at Red Onion. (Docket Item No. 89-2, ("McDuffie Declaration"), at 1.) Dr. Ahsan employs Dr. McDuffie. (Docket Item No. 89 at 3.) Dr. McDuffie provided contract services at Red Onion from January 2008 until June 2008. (Docket Item No. 91, ("Supplemental McDuffie Declaration"), at 1.) Additionally, Dr. McDuffie has provided contract services at Red Onion from July 2012 until the present. (McDuffie Declaration at 1.) Dr. McDuffie states QMHPs refer inmates to him for psychiatric care. (McDuffie Declaration at 2.) According to Dr. McDuffie, a QMHP refers an inmate to Dr. McDuffie when the QMHP determines that the inmate has mental health symptoms that can be treated with medication. (McDuffie Declaration at 2.) The QMHPs' referrals explain to the doctor why inmates need psychiatric care. (McDuffie Declaration at 2.) Dr. McDuffie states that no QMHP ever referred DePaola to him and that he has never treated DePaola. (McDuffie Declaration at 3.) Additionally, Dr. McDuffie states that he had "no knowledge of [DePaola] or his mental health status, history, or treatment, prior to the filing of this suit." (McDuffie Declaration at 3.) Dr. McDuffie states that he does not have access to DePaola's previous court records or any information related to DePaola's entry into VDOC. (Docket Item No. 109 at 4.) No mental health records attached as exhibits to Dr. McDuffie's summary judgment motion brief reference Dr. McDuffie or Dr. Ahsan.[4] (Docket Item No. 89-1.)

Dr. Ahsan is a psychiatrist who provides contract services to the inmates at Red Onion. (2nd Am. Compl. at ¶ 16.) Dr. Ahsan is Dr. McDuffie's employer. (2nd Am. Compl. at ¶ 16.) Dr. Ahsan "was the main provider of psychiatric

---

[4] A Mental Health Services Progress Note, dated October 24, 2014, and signed by QMHP S. Fletcher, states that DePaola expressed interest in seeing "the psychiatrist" due to depression. (Docket Item No. 89-1 at 8.) QMHP Fletcher noted that she would send a Mental Health History packet for DePaola to complete and return. (Docket Item No. 89-1 at 8.)

services for [Red Onion] from 1998 through approximately 2007." (Docket Item No. 114-1, ("Ahsan Declaration"), at 1.) DePaola also alleges that Dr. Ahsan "was the psychiatrist at [Red Onion]…between the years of 2010… and 2012." (2nd Am. Compl. at ¶ 16.) DePaola alleges that Dr. Ahsan never "responded to [DePaola's] requests for mental health evaluation and treatment," despite Dr. Ahsan's alleged knowledge of DePaola's 2010 suicide attempt. (2nd Am. Compl. at ¶ 34.) Dr. Ahsan was notified of the lawsuit when the summons and complaint were delivered on September 10, 2018. (Docket Item No. 114 at 3.)

The VDOC's standard operating procedures for Psychiatric Services are set out in VDOC Operating Procedure 730.7, ("OP 730.7"). (Docket Item No. 97-1.) OP 730.7 states that "[o]ffenders may be referred for psychiatric services by contacting the designated QMHP at the institution, or the designated treatment staff at [Marion Correctional Treatment Center] who will evaluate the need for psychiatric services and schedule psychiatric appointments as needed." (Docket Item No. 97-1 at 2.) It also states that psychiatric providers' duties shall encompass performing "evaluations and provide follow-up recommendations and psychopharmacological treatment for offenders referred for symptoms which indicate the presence of psychiatric, psychological, behavioral, emotional, cognitive, and/or neurological disorders." (Docket Item No. 97-1 at 2.) Moreover, it states that psychiatric providers shall "[a]ssess whether each offender referred for evaluation has a psychiatric disorder." (Docket Item No. 97-1 at 3.)

With the permission of the court, the parties recently filed additional evidence revealed in discovery for consideration on the Motions. This additional evidence includes excerpts from the discovery deposition of defendant Donnie Lee Trent II. (Docket Item No. 176-13, ("Trent Deposition")).  Trent testified that Dr.

McDuffie worked at Red Onion, usually, two days a week, on Thursdays and Fridays. (Trent Deposition at 3.) Trent also testified that Dr. Ashan would fill in for Dr. McDuffie on occasion. (Trent Deposition at 4.) Trent stated that he was not aware of anyone ever recommending any mental health treatment for DePaola that DePaola did not receive. (Trent Deposition at 5.) Other than one written request presented to him at this deposition, Trent stated that he was not aware of DePaola ever requesting mental health treatment, either orally or in writing. (Trent Deposition at 5.) Trent stated that, if he believed an offender needed to see a psychiatrist, he would present the offender's symptoms to the psychiatrist, and the psychiatrist would make the decision whether or not to see the offender. (Trent Deposition at 5.) Trent also stated that most mental health treatment at Red Onion is provided by QMHPs. (Trent Deposition at 7.) Trent said that he was not aware of a psychiatrist at Red Onion ever seeing an offender without a referral by a QMHP. (Trent Deposition at 7.) Trent said that he has been with Dr. McDuffie making rounds at Red Onion in the past when Dr. McDuffie has stopped to talk to offenders who have yelled at him from their cells. (Trent Deposition at 7.) Trent said that offenders who make threats of suicide are not always referred to the psychiatrist. (Trent Deposition at 9.)

Excerpts from the discovery deposition of defendant Terry Michael Huff also have been submitted for the court's review on the Motions. (Docket Item No. 176-14 ("Huff Deposition")). Huff also testified that Dr. McDuffie worked 20 hours a week at Red Onion, generally on Thursdays and Fridays. (Huff Deposition at 3.) Huff also stated that Dr. Ashan would fill in for Dr. McDuffie on occasion. (Huff Deposition at 3.) Huff stated that, despite an offender's mental health history, if an offender was functioning well and did not want mental health

treatment, he would not refer that offender to be seen by the psychiatrist. (Huff Deposition at 4-5.)

Excerpts from the discovery deposition of defendant Stephanie C. Fletcher also have been submitted for the court's review on the Motions. (Docket Item No. 176-15 ("Fletcher Deposition")). Fletcher testified that, when Dr. McDuffie came to Red Onion each week, the mental health staff would usually inform him of the offenders who had been on mental health precautions. (Fletcher Deposition at 3.) Fletcher said that, if an offender was placed in five-point restraints for mental health reasons during the workday, a mental health worker would immediately see and assess them. (Fletcher Deposition at 4.) Fletcher stated that Dr. Ashan had substituted for Dr. McDuffie at Red Onion for one weekend in the spring of 2016. (Fletcher Deposition at 6.)

Excerpts from the discovery deposition of defendant Jessica Ketron also have been submitted. (Docket Item No. 176-16 ("Ketron Deposition")). While plaintif's counsel represents that Ketron in her deposition stated that "the Red Onion psychiatrist is notified when inmates attempt suicide," that information is not contained in the excerpts provided to the court. Excerpts from the discovery deposition of defendant Denise Bartizal Malone also have been submitted. (Docket Item No. 176-17 ("Malone Deposition")). Malone stated that, in general, an offender who had attempted suicide should be referred to a psychiatrist. (Malone Deposition at 4.) Excerpts from the discovery deposition of defendant Kevin Douglas Mullins also have been submitted. (Docket Item No. 176-18 ("Mullins Deposition")). Mullins stated that, if an offender was placed in five-point restraints for mental health reasons, it would be documented in the offender's records, which were accessible to the psychiatrist. (Mullins Deposition at 5.) Excerpts from the

discovery deposition of defendant Earl Robert Barksdale also have been submitted. (Docket Item No. 176-2 ("Barksdale Deposition")). Barksdale stated that the Red Onion psychiatrist was not a VDOC employee and was not present at Red Onion every day. (Barksdale Deposition at 4.)

McDuffie's counsel has submitted additional excerpts from the discovery deposition of Fletcher. (Docket Item No. 170-1) ("Fletcher Deposition II"). Fletcher testified that an offender who was placed in five-point restraints for mental health reasons would not necessarily be referred to the psychiatrist. (Fletcher Deposition II at 6.) Fletcher also testified that an offender would not be referred to see a psychiatrist based on his request to do so; instead, a QMHP would assess the offender to determine if a referral to the psychiatrist was necessary. (Fletcher Deposition II at 9-10.) Fletcher also stated that she did not have any recollection of receiving repeated written or verbal requests from DePaola for mental health treatment. (Fletcher Deposition II at 11-12.) Fletcher testified that, if she believed an offender needed to be seen by the psychiatrist, she would then speak to Huff, who had the ultimate authority to speak to Dr. McDuffie regarding whether a referral was warranted. (Fletcher Deposition II at 16-17.) Fletcher said that it was her understanding that Huff never referred DePaola to be seen by Dr. McDuffie. (Fletcher Deposition II at 18.) Fletcher also testified that she did not refer DePaola to be seen by Dr. McDuffie. (Fletcher Deposition II at 20.)

McDuffie's counsel has submitted additional excerpts from the discovery deposition of Malone. (Docket Item No. 170-3) ("Malone Deposition II"). Malone testified that the "psych associates" or the "psych associates seniors" were the "gatekeepers" for making referrals of offenders to be seen by the facility psychiatrist. (Malone Deposition II at 3.) McDuffie's counsel also has submitted

additional excerpts from the discovery deposition of Mullins. (Docket Item No. 170-4) ("Mullins Deposition II"). Mullins testified that the psychiatrist at Red Onion became responsible for treating a particular offender through a referral of the offender by a QMHP. (Mullins Deposition II at 3.) Mullins also stated that he could not recall ever recommending that DePaola be seen by the psychiatrist or seeing such a recommendation in DePaola's mental health records. (Mullins Deposition II at 5.) Mullins also testified that the pods at Red Onion were noisy. (Mullins Deposition II at 6-7.)

Plaintiff's counsel also has provided the court with reports from expert witness Terry A. Kupers, M.D.. (Docket Item Nos. 176-6, -7.) These reports are not summarized here because, based on the undersigned's review, they contain no evidence relevant to the Motions.

## II.    Analysis

Dr. Ahsan argues that, pursuant to Federal Rules of Civil Procedure Rule 12(b)(6), DePaola has failed to state a claim against him for deliberate indifference to his serious medical needs. Under Rule 12(b)(6), a complaint can be dismissed for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12 also states that, if matters outside of the pleadings are presented to the court on a Rule 12(b)(6) motion, the motion must be treated as a motion for summary judgment. *See* FED. R. CIV. P. 12(d). Here, matters outside of the pleadings were presented for the court's consideration. Thus, the court will treat Dr. Ahsan's motion as a motion for summary judgment along with Dr. McDuffie's.

The standard of review for a motion for summary judgment is well-settled. The court shall grant summary judgment when the pleadings, discovery responses and record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). A genuinely disputed material fact exists if the evidence shows "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A court shall view the facts and reasonable inferences from the facts in the light most favorable to the nonmovant when ruling on a motion for summary judgment. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. To be successful, a summary judgment movant must demonstrate that "there is an absence of evidence to support the non-moving party's case" or that the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, Ky., 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.*, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256–57. Moreover, the nonmovant shall show more than a "mere scintilla" of evidence to overcome a summary judgment motion. *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (citation omitted).

-14-

DePaola's Second Amended Complaint alleges that Dr. McDuffie and Dr. Ahsan were deliberately indifferent to DePaola's mental health needs and failed to treat or diagnose his mental health needs in violation of DePaola's Eighth Amendment right to be free from cruel and unusual punishment. Under the Eighth Amendment, punishments that "involve the unnecessary and wanton infliction of pain" are prohibited. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). The Eighth Amendment protects inmates from inhumane treatment and conditions while incarcerated. S*ee Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). Prisons must provide adequate medical care to inmates. *See Estelle*, 429 U.S. at 103; *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016). Prisoners' Eighth Amendment rights are violated when prison officials exhibit "deliberate indifference" to a prisoner's serious medical needs. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). Prisoners' rights to adequate medical care related to prisoners' physical and mental health claims are identical. *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977). Courts have recognized that "[d]eliberate indifference is a very high standard" and demonstrating mere negligence is insufficient. *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999).

In *Estelle*, the Supreme Court outlined three ways a prisoner's deliberate indifference claim related to serious medical needs may arise: 1) prison doctors' inadequate responses to the prisoner's needs; 2) guards deliberately delaying or denying access to medical attention; or 3) intentional interference with a prescribed treatment. *See Estelle*, 429 U.S. at 104–05. A prisoner's deliberate indifference claim has two components, an objective and a subjective element. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the prisoner must demonstrate that he has a serious medical need. *See Iko*, 535 F.3d at 241. A condition a physician diagnosed as requiring treatment, as well as a condition that

a lay person could easily identify as requiring a physician's treatment, both constitute a "serious medical need." *Iko*, 535 F.3d at 241.

Subjectively, the prisoner must demonstrate that the defendant acted with deliberate indifference to those needs. *See Iko*, 535 F.3d at 241. A defendant shall be held liable for violating an inmate's Eighth Amendment rights if the defendant knew of and consciously disregarded "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). A defendant may be liable for a 42 U.S.C. § 1983 violation where the plaintiff affirmatively shows that the defendant "acted personally in the deprivation of the plaintiffs' rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (citation omitted). Specifically, a prison official exhibits deliberate indifference to a prisoner's serious medical needs if the official had actual knowledge of said needs and the associated risks, but ignored them. *See Scinto*, 841 F.3d at 225-26. To satisfy the subjective knowledge requirement, a plaintiff must prove "direct evidence of the official's actual knowledge" or demonstrate circumstantial evidence establishing knowledge; circumstantial evidence can be established by showing that the "official knew of a substantial risk from the very fact the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

There is no federal statute of limitations period for actions brought pursuant to 42 U.S.C. § 1983. *See Wilson v. Garcia*, 471 U.S. 261, 266 (1985). The statute of limitations for such actions is governed by state law. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). Specifically, the statute of limitations period from the applicable state law statute of limitations for personal injury in the state where the alleged wrong occurred applies. *See Owens v. Okure*, 488 U.S. 235, 239-40 (1989).

In Virginia, a plaintiff must bring a personal injury cause of action within two years from the date the action accrued. *See* VA. CODE ANN. § 8.01-243(A) (2015 Repl. Vol. & 2018 Supp.). Normally, a § 1983 action alleging deliberate indifference accrues when a plaintiff "possesses sufficient facts about the harm done to him that a reasonable inquiry will reveal his cause of action." *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (citation omitted). However, the Fourth Circuit recently recognized that a prisoner can assert a 42 U.S.C. § 1983 claim for deliberate indifference to serious medical needs outside the statute of limitations by utilizing the "continuing violation" theory. *DePaola v. Clarke*, 884 F.3d 481, 487 (4th Cir. 2018). The Court of Appeals found that, under the "continuing violation" theory, "a plaintiff must (1) identify a series of acts or omissions that demonstrate deliberate indifference to his serious medical need(s); and (2) place one or more of these acts or omissions within the applicable statute of limitations for personal injury." *DePaola*, 884 F.3d at 487. This doctrine is inapplicable to actions based on "discrete acts of unconstitutional conduct" or actions that "fail to identify acts or omissions within the statutory limitation period that are a component of the deliberate indifference claim." *DePaola*, 884 F.3d at 487 (citing *Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009)). However, the Second Circuit has recognized "[t]hat the continuing violation doctrine *can* apply, however, does not mean it must." *Shomo*, 579 F.3d at 182 (emphasis in original).

I first will address DePaola's alleged series of acts or omissions by Dr. McDuffie and Dr. Ahsan that might demonstrate deliberate indifference to DePaola's serious medical needs before addressing whether or not these alleged acts or omissions occurred within Virginia's statute of limitations for personal injury under the Fourth Circuit's "continuing violation" doctrine.

-17-

A. Serious Medical Needs

In this case, DePaola has produced evidence from which a jury could find that he has a serious medical need, satisfying the objective prong of the deliberate indifference standard. Specifically, DePaola has produced evidence that he was evaluated by a psychologist in 2003, who noted DePaola's extensive mental health history and treatment and found that he likely suffered from bipolar disorder. The doctor stated that, while incarcerated, DePaola should continue receiving treatment for his mental health issues. Also, DePaola has produced evidence that he notified QMHP Ketron on May 26, 2010, that he was contemplating hanging or cutting himself. Although DePaola denied he was suicidal to QMHP Mullins on May 27, 2010, he claims he then attempted suicide by refusing to eat for the following 16 days. Even if the court were to find DePaolo's previous mental health diagnoses too remote, I believe that even a layman would recognize DePaola's conflicting statements regarding suicidal ideations and his self-imposed starvation as sufficiently evidencing the existence of a serious medical need. Furthermore, DePaola alleges that he continues to suffer from severe depression, hallucinations, acute anxiety and feelings of hopelessness and helplessness.

Based on the above, I find that DePaola has produced sufficient evidence to create a genuine dispute of material fact as to the objective element of a deliberate indifference claim. DePaola, however, has failed to produce sufficient evidence to create a genuine dispute of material fact as to the subjective element of his deliberate indifference claims against these defendants. Specifically, DePaola has not produced any evidence that either Dr. McDuffie or Dr. Ashan had any

knowledge of DePaola's prior mental health history, his threats of suicide or his attempt to starve himself.

## B. Deliberate Indifference

In a civil rights case, liability is personal and "based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). To establish a deliberate indifference claim, a prisoner must show that a defendant was personally aware of and consciously disregarded an excessive risk of serious harm. *See Farmer*, 511 U.S. at 838. A plaintiff can show deliberate indifference from actual intent or reckless disregard. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). To establish deliberate indifference by a health care provider, a plaintiff must demonstrate that the defendant's treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851, overruled in part on other grounds by *Farmer*, 511 U.S. at 837.

Federal courts evaluate defendants' contacts with prisoners in deliberate indifference claims when evaluating whether or not the defendants violated plaintiffs' Eighth Amendment rights. *See Estelle*, 429 U.S. at 107*; see also Jervis v. Mitcheff*, 258 F. App'x 3 (7th Cir. 2007); *see also Tharrington v. Virginia*, 2018 WL 4515899, at *8 (W.D. Va. Sept. 20, 2018). Since the Supreme Court and other courts have evaluated deliberate indifferent claims by analyzing the plaintiffs' and defendants' contacts, I will examine the evidence presented of DePaola's contacts with Dr. McDuffie and Dr. Ahsan.

In *Estelle*, the Supreme Court analyzed the plaintiff's contacts with his doctors. *See Estelle*, 429 U.S. at 107. The Court tallied the number of visits the plaintiff had with each of his treating doctors over a three-month period, finding that the plaintiff had been treated 17 times during the period. *See Estelle*, 429 U.S. at 107. Unlike the plaintiff in *Estelle*, DePaola can point to no treatment he received from either Dr. McDuffie or Dr. Ahsan during the time period he has been incarcerated at Red Onion. DePaola asserts this lack of treatment as evidence that his medical needs were consciously disregarded by both doctors. In *Estelle*, the Court found that the plaintiff's doctors had treated him for a variety of ailments during the relevant time period. Unlike the plaintiff in *Estelle*, however, DePaola admits that he was never evaluated or treated by either Dr. McDuffie or Dr. Ahsan.

In *Jervis*, the Seventh Circuit similarly looked to the defendant's initial evaluation and subsequent contacts with the plaintiff when it evaluated if the defendant was deliberately indifferent to the prisoner's serious medical needs. *See Jervis*, 258 F. App'x 3. There, the defendant, Dr. Mitcheff, initially examined the prisoner and found "nothing wrong with him." *Jervis*, 258 F. App'x at *4. The plaintiff subsequently complained to Dr. Mitcheff that he was continuing to experience pain, but Dr. Mitcheff never examined his patient again nor investigated, diagnosed or treated his patient's medical needs further. *See Jervis*, 258 F. App'x at *5. Unlike the doctor and patient in *Jervis*, DePaola has produced no evidence that Dr. McDuffie or Dr. Ahsan ever had a physician/patient relationship with him. Again, by DePaola's own admission, he states that he has never seen any psychiatrist at Red Onion. Thus, unlike the plaintiff in *Jervis*, DePaola can point to no diagnosis derived from either Dr. McDuffie or Dr. Ahsan.

In *Tharrington*, this court recently evaluated a doctor's contacts with a prisoner when it determined that the doctor was deliberately indifferent to the prisoner's serious medical needs. *See Tharrington*, 2018 WL 4515899, at **1–3, *8. Specifically, this court looked to the date of the initial evaluation, December 23, 2014, to determine when the doctor had actual knowledge of the prisoner's medical needs. *See Tharrington*, 2018 WL 4515899, at *1. Then the court looked at the defendant's subsequent acts to determine when the doctor consciously disregarded those needs. *See Tharrington*, 2018 WL 4515899, at *8. This court found that the doctor initially evaluated the prisoner, but subsequently refused to: (1) properly treat; (2) prescribe additional medication; and (3) follow up with the prisoner. *See Tharrington*, 2018 WL 4515899, at *8. Furthermore, this court noted that the doctor angrily confronted the prisoner after the prisoner reported the doctor's actions to an advisory board, demonstrating not only the doctor's actual knowledge of the medical needs, but an actual animus towards the prisoner, which was evidence of his conscious disregard for the prisoner's medical needs. *See Tharrington*, 2018 WL 4515899, at *8. Here, DePaola can show no instances where Dr. McDuffie or Dr. Ahsan evaluated or treated him.

In a case similar to DePaola's, this court recently found that a defendant psychologist was not deliberately indifferent to a plaintiff's serious medical needs because the psychologist never evaluated or treated the plaintiff. *See Sovereign v. Fleming*, 2016 WL 4595695, at *2 (W.D. Va. Sept. 2, 2016), *appeal dismissed*, 698 F. App'x 87 (4th Cir. 2017). There, the court found that the psychologist "was not involved with Plaintiff's mental health care, was not asked to assess Plaintiff, did not receive any request for care from Plaintiff, and had no knowledge that Plaintiff was suicidal before his suicide attempt." *Sovereign*, 2016 WL 4595695, at *2. Like the psychologist in *Sovereign*, there is no evidence before the court that

Dr. McDuffie or Dr. Ahsan was involved with DePaola's mental health care, was referred to treat DePaola, ever received a request from Red Onion's QMHPs to treat DePaola or had any knowledge of DePaola's mental health history or medical needs.

Dr. McDuffie stated that, not only did he not evaluate or treat DePaola, but he did not know who DePaola was or his mental health issues or history prior to this case being filed. (McDuffie Declaration at 2.) DePaola's numerous admissions indicate that he was never evaluated or treated by Dr. McDuffie or Dr. Ahsan at Red Onion. (2nd Am. Compl. at ¶¶ 9, 34, 45, 62, 68; Docket Item No. 96-3 at 4.). Consequently, no doctor/patient relationship existed between DePaola and Dr. McDuffie or Dr. Ahsan that would have provided the doctors with any actual knowledge of DePaola's serious medical needs to consciously disregard. Another court has held that a defendant was not deliberately indifferent to a plaintiff's medical needs when the defendant was "unaware that plaintiff had any mental health issues." *Cook v. Pamunkey Reg'l Jail*, 2016 WL 5842773, at *4 (E.D. Va. Oct. 4, 2016). Like the defendant in *Cook*, DePaola was not referred to Dr. McDuffie or Dr. Ahsan, and they did not meet with DePaola. Thus, DePaola has failed to produce evidence that Dr. McDuffie or Dr. Ahsan had any actual knowledge of his serious mental health needs.

Additionally, DePaola's conclusory statement that Dr. Ahsan knew of his suicide attempt and serious medical needs is not sufficient to create a genuine dispute of material fact. DePaola claims that Dr. Ashan knew of his suicide attempt because the QMHP told him that he/she would tell Red Onion's psychiatrist of DePaola's needs if DePaola started eating again. Nowhere does DePaola state who

made this statement, nor has he produced any evidence that this information was ever conveyed to Dr. Ahsan.

Additionally, VDOC's policy for Psychiatric Services dictates that psychiatric providers, like Dr. McDuffie and Dr. Ahsan, are expected to evaluate referred offenders and assess them for psychiatric disorders. (Docket Item No. 97-1 at 3.) Under the VDOC's policy, the psychiatric providers have no duty to evaluate offenders not referred to them. Moreover, under the VDOC policy, QMHPs decide, if needed, when "[o]ffenders may be referred for psychiatric services." (Docket Item No. 97-1 at 2.)  Here, the QMHPs determined that a psychiatric referral was unwarranted. (Docket Item No. 89-1 at 22.) While this might be evidence of the QMHPs' deliberate indifference to DePaola's serious medical needs, it is not evidence of deliberate indifference on the part of Dr. McDuffie or Dr. Ashan.

Even assuming that DePaola, on occasion, called out to Dr. McDuffie when Dr. McDuffie neared his cell, that is not enough to establish the violation of a constitutional right. DePaola's allegation that Dr. McDuffie responded "[N]ope" and "I don't make rounds" is not enough to establish that Dr. McDuffie refused care with a wanton disregard for DePaola's serious medical needs. Assuming Dr. McDuffie made those statements, it may show Dr. McDuffie had knowledge that DePaola wanted Dr. McDuffie's attention, but it is not evidence that Dr. McDuffie had actual knowledge of, and consciously disregarded, DePaola's serious medical needs. If that were the standard, correctional institutions would be devoid of medical staff to treat inmates, as the staff members would be in court continually defending deliberate indifference claims filed by inmates who had yelled at every passerby. Red Onion must ration scarce resources among many prisoners demanding various, and, sometimes questionable, medical needs. *See, e.g.*, *Turner*

*v. Safley*, 482 U.S. 78, 89 (1987). Moreover, even if Dr. McDuffie heard DePaola state he was in "psychological distress" and "needed help" that does not demonstrate that Dr. McDuffie consciously disregarded DePaola's serious medical needs. Under VDOC policy, Dr. McDuffie cannot unilaterally evaluate, diagnose or treat DePaola at his cell door upon DePaola's demand, as Dr. McDuffie is a contract provider and needs a referral from a QMHP to treat a prisoner.

Knowledge of DePaola's 2010 suicidal statements and subsequent starvation cannot simply be imputed to Dr. McDuffie or Dr. Ahsan years later without some evidence that they had notice of these. In addition, Dr. McDuffie has provided evidence that he provided services to Red Onion inmates for only six months in 2008 and started providing psychiatric services there again in July 2012. The facts indicate that Dr. McDuffie had no contacts with any Red Onion prisoners for four years in between July 2008 and July 2012. As such, he was not even present in 2010 and could not have had actual knowledge of DePaola's serious medical needs at that time.

Based on the above, I find that DePaola has failed to produce sufficient evidence to create a genuine dispute of material fact as to the subjective element of his deliberate indifference claims against either Dr. McDuffie or Dr. Ahsan. Based on this finding, I find it unnecessary to address these defendants' statute of limitations arguments.

# PROPOSED FINDINGS OF
# FACT AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following findings, conclusions and recommendations:

1. There is no genuine dispute of material fact as to whether Dr. McDuffie was deliberately indifferent to DePaola's serious medical needs; and

2. There is no genuine dispute of material fact as to whether Dr. Ashan was deliberately indifferent to DePaola's serious medical needs.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the Motions with regard to DePaola's claims against Dr. McDuffie and Dr. Ahsan and enter summary judgment in their favor.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636 (b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge

may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in the matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

ENTER: March 18, 2019.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE