# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **ERIC J. DePAOLA,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:15CV00403 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **HAROLD CLARKE, ET AL.,** | ) | By:  James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Charles C. Moore and Alyson M. Cox, White & Case LLP, Washington, D.C., for Plaintiff; Margaret Hoehl O'Shea, Assistant Attorney General, Office of the Attorney General of Virginia, Richmond, Virginia, for Defendants Fred Schilling, E. R. Barksdale, Stephanie Fletcher, Terrence Huff, Donnie Lee Trent, Denise Malone, Jessica Ketron, Kevin Mullins, Jeffrey Kiser, Randall Mathena, and Tracy Ray.*

Eric J. DePaola, a Virginia inmate, asserts claims pursuant to 42 U.S.C. § 1983 against several prison administrators and mental health professionals.  He contends that they violated his Eighth Amendment rights by failing to adequately treat his serious mental health needs.  Following discovery, the defendants have moved for summary judgment.  I find that the motion should be granted as to certain of the defendants, either as time-barred, based on qualified immunity, or as factually insufficient as a matter of law.  However, I will deny summary judgment as to defendants Fletcher, Huff, and Trent.

# I.

This case has a lengthy procedural history. In 2015, DePaola, proceeding pro se, commenced this suit against defendants Schilling, Barksdale, Fletcher, Huff, Trent, and a number of other defendants who are no longer parties to the case. He asserted a claim related to treatment of his alleged physical ailments along with a claim that the defendants failed to diagnose or treat his mental health issues. The defendants filed motions to dismiss, which I granted. I held that "DePaola's complaints about prison life that accrued before July 19, 2013, are barred by the two-year limitations period." *DePaola v. Clarke*, No. 7:15CV00403, 2016 WL 5390930, at *3 (W.D. Va. Sept. 27, 2016). Regarding his mental health-related claim, I held that DePaola had failed to allege facts sufficient to state a claim of deliberate indifference to his serious mental health needs.

DePaola appealed the dismissal of his claims, and the court of appeals appointed counsel to represent him on appeal. The court of appeals affirmed my dismissal of DePaola's physical health-related claims, but it reversed my dismissal of DePaola's mental health-related claims.

The court of appeals applied the continuing violation doctrine, holding that the statute of limitations on a prisoner's claim for a continuing violation of his Eighth Amendment rights would not begin to run "until the date, if any, on which adequate treatment was provided." *DePaola v. Clarke*, 884 F.3d 481, 487 (4th Cir.

2018). Moreover, "[a] plaintiff's claim of a continuing violation may extend back to the time at which the prison officials first learned of the serious medical need and unreasonably failed to act." *Id.* The court held that DePaola had alleged a continuing violation of his Eighth Amendment rights by the defendants named in the original Complaint that continued within the two years prior to his filing of the Complaint, and therefore his mental health-related claims against those defendants were not time-barred.[1]

The court of appeals further held that "DePaola's allegations of deliberate indifference to his serious mental illnesses are sufficient to state a claim against defendants Barksdale, Schilling, Fletcher, McDuffie, Huff, and Trent, because he has alleged serious needs about which those defendants knew and failed to provide necessary treatment." *Id.* at 488. The court of appeals thus remanded DePaola's mental health-related claims to this court for further proceedings.

DePaola's appellate counsel has continued to represent him following the remand. With leave of court, DePaola filed an Amended Complaint on June 20, 2018, which added defendants Mathena, Ray, Kiser, Mullins, Malone, Ketron, and Everett McDuffie, M.D., a psychiatrist. Dr. McDuffie filed a Motion for Summary Judgment. DePaola then sought leave to file a Second Amended Complaint adding defendant Syed Zafar Ahsan, M.D., another psychiatrist, which I granted. Dr.

---

[1] The court noted that it had not before explicitly applied the continuing violation doctrine to a § 1983 claim of deliberate indifference to medical needs. *Id.*

Ahsan moved to dismiss with documents outside of the pleadings, and his motion was converted to a Motion for Summary Judgment. The motions by Drs. McDuffie and Ahsan were referred to a magistrate judge, who issued a Report and Recommendation recommending that I grant them. DePaola objected to that recommendation.

Defendants Schilling, Barksdale, Fletcher, Huff, Trent, Malone, Ketron, Mullins, Kiser, Mathena, and Ray (collectively, "remaining defendants") then moved for summary judgment.[2] The parties fully briefed and orally argued that motion, along with the objections to the Report and Recommendation. Following oral argument, I overruled DePaola's objections to the Report and Recommendation and granted summary judgment in favor of Drs. McDuffie and Ahsan. *DePaola v. Clarke*, No. 7:15CV00403, 2019 WL 2484295, at *4 (W.D. Va. June 14, 2019). I also granted the parties leave to file supplemental briefs on the issue of qualified immunity. Those briefs have now been submitted, and the pending Motion for Summary Judgment by the remaining defendants is ripe for decision.

The Second Amended Complaint contains two counts. Count I asserts a claim against all defendants for their deliberate indifference to DePaola's serious

---

[2] Dr. Ahsan also joined this Motion for Summary Judgment, but the pending motion is moot as to Dr. Ahsan because I have already granted his earlier motion and entered judgment in his favor.

- 4 -

mental health issues.  It seeks compensatory and punitive damages, as well as injunctive relief.  Count II names only defendant Malone, a prison system administrator, and alleges that her failures to adequately train her subordinates and to create sufficient policies and procedures resulted in harm to DePaola's mental health.  Count II also seeks compensatory and punitive damages and injunctive relief.

## II.

The following facts taken from the summary judgment record are either undisputed or, where disputed, are stated in the light most favorable to DePaola, the nonmovant.

DePaola's incarceration with the Virginia Department of Corrections ("VDOC") began in 2004 when he was a teenager.  A court-ordered mental health evaluation performed when he entered the VDOC system indicated that he may have been in the early stages of bipolar disorder; that he suffered from depression, impulsivity, suicidal thoughts, and hallucinations; and that he should receive ongoing mental health treatment.  DePaola has been housed at Red Onion State Prison ("Red Onion") since 2007 and was placed in restrictive housing immediately upon arrival there.  He had received a disciplinary infraction at another state prison for possessing a weapon in his shoe.  In December 2008, he was transferred to a progressive housing unit with the intention of moving him to a

lower security level. However, in June 2009, while awaiting transfer to a lower security facility, DePaola stabbed a corrections officer. He was then moved back to segregation.

DePaola was criminally charged for the stabbing and evaluated to determine his competency to stand trial. A licensed clinical psychologist, Dr. Steward, conducted the examination at Red Onion. Dr. Steward issued a report on November 9, 2010, diagnosing DePaola with depression and anxiety and recommending that DePaola receive treatment for those and other mental health issues.

Most of DePaola's years at Red Onion have been spent in segregation, although he has been moved for brief periods to less restrictive housing. He received charges for possessing sharpened instruments as recently as 2018. At oral argument, counsel represented that DePaola is currently placed in a less restrictive unit that mimics general population, allowing him to have a job and to participate in recreational activities.

During his more than 15 years of incarceration with VDOC, DePaola has had approximately 72 documented interactions with Red Onion mental health staff, most of which took place at the door to his cell and lasted only a few minutes. Until February 2019, he had never spoken to a psychiatrist or psychologist while at Red Onion, nor has he ever been given any medication for his mental illness. The

remaining defendants claim they never witnessed any behavior that revealed a need for mental health treatment. However, for purposes of their summary judgment motion, they concede that there is at least a genuine factual issue as to whether DePaola has an objectively serious mental health need.

In 2010, DePaola claimed to be suicidal. He was placed in five-point restraints. A mental health staff member reported that DePaola later told him that he had been joking and just wanted to be moved out of his segregation housing unit, but DePaola denies this. He received no treatment after this incident.

For 16 days thereafter, DePaola went on a hunger strike, allegedly attempting to kill himself by starvation. He ultimately missed at least 29 meals. He alleges that he began eating again after being informed that he would be able to speak with Dr. Ahsan, the prison's psychiatrist. He never actually saw or spoke with Dr. Ahsan or another psychiatrist.

DePaola filed several written grievances and complaints regarding his mental health treatment. On April 12, 2010, he filed a grievance stating that he was not classified as a mentally ill inmate and did not want to be housed with mentally ill inmates. He was upset that he had to listen to the constant shouting and banging from other inmates.

On April 23, 2010, DePaola submitted an informal complaint stating that he had asked to see a psychologist several times but had received no response.

Defendant Jessica Ketron, a Qualified Mental Health Professional ("QMHP"), indicated there was no record of those requests. She stated that she had attempted to meet with DePaola but he had been sleeping. He was advised to resubmit his request. On May 11, 2010, DePaola submitted a grievance stating he had not been seen by a QMHP. The grievance was deemed unfounded, and it was noted that he had been seen by Ketron on July 13, 2010.

For the next four and a half years, DePaola did not submit any other requests, complaints, or grievances requesting mental health treatment. He submitted a complaint on November 24, 2014, stating that he had verbally asked to see mental health professionals, but his request had been ignored. Defendant Stephanie Fletcher, a QMHP, responded that she was in the process of reviewing his records and that he would be informed of the mental health department's decision.

In December 2014, DePaola submitted a grievance asking to be seen by a psychiatrist. The grievance was rejected on the ground that DePaola had requested services which are not encompassed by the grievance process. On January 14, 2015, DePaola submitted a complaint requesting access to mental health services. Fletcher responded, stating that DePaola was receiving mental health services. DePaola then filed a grievance asking to be seen by a psychologist or mental health

professional. QMHP Huff responded in a memorandum summarizing DePaola's recent contacts with mental health.

DePaola did not submit any emergency grievances between 2014 and the present in which he claimed to be suicidal or requested attention from mental health staff, despite submitting emergency grievances complaining about various other topics.

VDOC's QMHPs must have at least a master's degree in psychology, social work, or a relevant human services field and must be trained in the diagnosis and treatment of mental disorders. They work under the supervision of a licensed clinical psychologist and are not supervised by the Warden. All staff responsible for supervising inmates receive annual suicide prevention training. Mental health staff also receive annual training on other topics.

Each inmate is assessed by a QMHP upon arrival at Red Onion and is given a mental health classification code. The QMHP should review available records as part of this assessment, in addition to talking to the inmate about things like mental health history and suicidal ideations. The classification codes range from MH-0, indicating no mental health needs, to MH-4, reflecting serious mental illness ("SMI"). When an inmate is assessed MH-2 or higher, the QMHP should request recent and pertinent mental health records from outside providers. In determining

the code to assign, the QMHP is to focus on the current mental health status rather than solely on history of treatment.

The codes may be revised based on the inmate's overall progress and stability. Every inmate classified as MH-1 or higher receives an annual review. Those with a code of MH-0 do not automatically receive a status review, but their counselor can request one.

Psychiatric services are provided by an outside contractor. A QMHP can refer an inmate to the psychiatrist. The psychiatrist is not supervised by the Chief of Mental Health Services. The psychiatrist sees nine to 15 inmates per day when at Red Onion, and QMHPs try to screen his caseload so that only the inmates who really need to see him will see him. The QMHPs essentially act as gatekeepers to the psychiatrist.

Inmates can request mental health service at any time and can use the grievance procedure to lodge complaints about mental health care. An inmate can press a button in his cell to contact a correction officer for immediate assistance. An inmate assigned to restrictive housing who has not been screened within the last 12 months should be screened within 24 hours of assignment to determine whether he is at risk of harm to self or others or deterioration. Those determined to be at risk are seen after one day in special housing, and then the QMHP determines how often to assess them thereafter. Those with a code of MH-1 or higher should

be assessed at least every 30 days.  Those with a code of MH-0 are to be assessed a minimum of every three months.

A.

The record contains the following evidence as to each individual remaining defendant.

1.  QMHP Stephanie Fletcher.

Fletcher was hired as a Psychology Associate I in October 2013.  She has a Master of Education degree in counseling and human development.  She has completed some coursework toward a Ph.D. in educational psychology.

On October 24, 2014, Fletcher interacted with DePaola during monthly rounds in restricted housing.  He reported being depressed and asked to see the psychiatrist.  He denied suicidal or homicidal ideations.  She advised that she would send him a Mental Health History packet to complete, but he never sent it back to her.  Fletcher opined that he did not present any mental health issues.  She opted to keep DePaola classified as MH-0.  Her visit documentation says that DePaola had just returned from Marion Correctional Treatment Center, which was incorrect, leading DePaola to surmise that this document actually refers to an assessment of a different inmate.

In response to an informal complaint, Fletcher noted that she had told DePaola on October 24, 2014, that there was a process for consideration to see the

psychiatrist and that she was reviewing his medical records for that purpose. This response was submitted on December 9, two and a half months after the referenced conversation. On January 29, 2015, in response to another complaint, Fletcher stated that DePaola was receiving mental health services and that mental health would continue to monitor him.

Fletcher testified that she needs to spend some time with an inmate in order to assess the person and determine if he is malingering. She stated that visits for an MH-0 inmate only lasted a few minutes, long enough to introduce herself and ask if the inmate had any issues.

## 2. QMHP Terrence Huff.

Huff was hired as a Psychology Associate I in January 2007. In January 2015, he was promoted to Psychology Associate II and became the supervisor of Red Onion's mental health services. Huff has a Master of Education degree in mental health counseling and human development. He retired in January 2019.

Huff did routine 90-day checks on DePaola on July 17, 2007, October 16, 2007, and January 23, 2008, and noted no concerns. He tried to talk to DePaola on June 7, 2010, regarding DePaola's hunger strike, but DePaola was uncooperative. Huff noted that DePaola had his property packed as if he was anticipating moving cells. Huff tried to talk to DePaola again on June 14, 2010, but DePaola was

uncooperative. On June 21, 2010, Huff interacted with DePaola and noted that DePaola had been eating again and displayed no signs of mental disorder.

On April 21, 2011, Huff did a 90-day check and noted no concerns. On May 3, 2011, Huff performed a 30-day assessment following DePaola's placement in restrictive housing. He noted no concerns. He recommended that DePaola's status be changed from MH-1 to MH-0. Huff attempted to do a 90-day check on July 11, 2011, but DePaola was not in his cell. Huff observed that the cell was neat and tidy and staff had not reported any concerns or problems.

On October 27, 2011, and January 18, 2012, Huff performed 90-day checks on DePaola and noted no concerns. Huff again met with DePaola for a 90-day check on July 11, 2013. Huff performed a mini-mental state examination ("MMSE"), which is a brief paper and pencil questionnaire used to assess cognitive functioning. A score of 24 to 30 indicates that a person is functioning within the normal range. DePaola scored 29. Huff noted no impairments or mental health complaints. With Huff's blessing, DePaola was moved to a closed housing unit mirroring general population. DePaola had no documented interactions with mental health staff for more than 13 months after his move to this housing unit.

Huff met with DePaola on February 4, 2015, at DePaola's request while he was in restrictive housing. Huff administered a MMSE in a office. DePaola scored 30. Huff noted no concerns.

In response to a 2015 grievance, Huff prepared a memorandum summarizing DePaola's recent contacts with mental health staff. He concluded that DePaola had been monitored and had not been denied access to mental health services. When DePaola appealed this response, VDOC Chief of Mental Health Services Denise Malone emailed Huff requesting information. Huff responded by email, noting that DePaola had recently scored well on an MMSE and that there was no basis for diagnosing DePaola with a mental illness. As a result, Malone recommended that the appeal be deemed unfounded by the VDOC Health Services Director, and it was.

In November 2015, after DePaola filed this suit, Huff wrote a memorandum to then-Warden Barksdale summarizing DePaola's records and reporting that the mental health department had not seen any indications of an SMI and that referral to a psychiatrist had not been warranted. On November 15, 2016, Huff again reviewed DePaola's available records and determined that he did not meet the criteria to be designated as having a SMI. On two occasions, Huff completed monitoring reports when he had not actually spoken with DePaola, a practice Malone testified was not appropriate.

### 3. QMHP Donnie Lee Trent.

Trent was hired as a Psychology Associate I in March 2015. Trent has a Master of Education degree in mental health counseling and human development.

Trent did 90-day checks on DePaola on April 28, 2015; August 7, 2015; November 16, 2015; April 28, 2016; August 16, 2016; and November 2, 2016 and noted no concerns. Trent performed a 30-day special housing review on May 8, 2017, and noted no concerns. He did a 90-day check on June 28, 2017, during which DePaola declined an office visit. Trent again noted no concerns.

On April 25, 2018, Trent evaluated DePaola in his cell after DePaola was placed in restrictive housing. DePaola denied suicidal or homicidal ideations. Trent decided to maintain DePaola's MH-0 classification. Trent recalls DePaola telling him he was planning to sue the mental health department because mental health was the reason for his incarceration.

In December 2015, DePaola submitted a request to be seen by a QMHP. Trent responded that DePaola was being seen once every three months, in accordance with policy, based on his lack of symptoms.

DePaola declares that he told Trent during cell-front visits about his mental health history and current mental health issues. Trent testified that numerous inmates say they are depressed, and he cannot put every one of them on the psychiatrist's list.

Trent's forms regarding DePaola contained errors where he had inadvertently written things about other inmates on the wrong form. For example, on one form, he had referenced DePaola's broken English, but DePaola is a native English speaker.

### 4. QMHP Jessica Ketron.

Ketron was a Psychology Associate from January 2008 until March 2011. Ketron has a master's degree in counseling and a Bachelor of Science degree in psychology.

Ketron did a 90-day check on DePaola on July 23, 2008. He denied having any mental health issues. She reviewed his MH-0 status on October 3, 2008. She noted his history of self-injurious behavior and psychotropic medication, but indicated he did not have any present symptoms, so she kept him at MH-0. She conducted another 90-day check on October 30, 2008, and he denied any issues.

Ketron attempted to do a 90-day check on April 26, 2010, but DePaola was sleeping. He stirred and looked at her but did not respond. She reviewed his cell door charts, noted that he had been accepting recreation, showers, and meals, and noted no concerns. She did not return later.

On May 18, 2010, Ketron spoke with DePaola at his request. She thought he might be malingering. She noted she would speak with security about moving him to a different cell and that he would be monitored.

On May 26, 2010, she assessed DePaola in response to an emergency grievance stating he was having suicidal thoughts. She recommended placing him in restraints and on a 15-minute watch, among other precautions, and noted that any behavioral changes should be reported to a QMHP.

On June 3, 2010, Ketron assessed DePaola after a report that he had refused nine meals. DePaola was uncooperative. She tried to assess him again on June 8, 2010, but he was not in his cell. She assessed him on June 10, 2010, but he refused to acknowledge her.

On July 13, 2010, Ketron assessed DePaola as part of a routine 90-day review. He denied having a serious mental disorder. She recommended that his status be changed from MH-0 to MH-1 based on her review of his records as well as her in-person assessment. She recommended that he could remain in special housing. She did a 90-day check on October 29, 2010 and noted no concerns.

On November 5, 2010, Ketron emailed then-Warden Ray to inform Ray that psychologist Dr. Steward would be visiting Red Onion to evaluate DePaola's competency related to a criminal case. She did not follow up with Dr. Steward after the examination or request to see his report.

### 5. QMHP Kevin Mullins.

Mullins was a Psychology Associate from January 2005 until December 2010 and holds a master's degree in social work. He met with DePaola on four occasions. Mullins testified that he did not take notes during cell-front meetings.

Mullins conducted a 90-day review of DePaola on April 27, 2007 and noted no concerns. Mullins spoke with DePaola on May 27, 2010, the day after he reported suicidal thoughts, while he was on a meal break from the five-point restraints. Mullins noted that DePaola told him he had been joking and was not trying to hurt himself. Mullins wrote that he thought DePaola was claiming to be suicidal in an effort to be moved to different housing. The next day, Mullins recommended that DePaola be removed from suicide precautions and returned to special housing. He did not provide any treatment. On June 9, 2010, Mullins assessed plaintiff in response to the hunger strike, but plaintiff was uncooperative. Mullins testified that in his building, there was very little counseling available.

### 6. Warden Jeffrey Kiser.

Kiser is the current Warden of Red Onion. He testified that he has never observed signs of mental deterioration in DePaola, and he says Plaintiff has never complained to him about his mental health care. DePaola disputes this, stating that he has told Kiser about his mental health history and need for treatment. He says he has spoken to Kiser while Kiser performed rounds.

### 7.  Warden Earl Barksdale.

Barksdale was the Warden of Red Onion from 2015 until January 2017.  He reviewed a grievance from DePaola, received a report from Huff that the grievance was unfounded, and then issued a determination that the grievance was unfounded. Barksdale says he never received information that DePaola was experiencing suicidal thoughts.   However, DePaola declares that he told Barksdale during rounds that he needed mental health treatment and informed him of his mental health history.

### 8.  Warden Randall Mathena.

Mathena was the Warden of Red Onion from October 2011 until 2015.  He does not recall ever reviewing any grievances or complaints related to DePaola's medical or mental health and did not observe any unusual behavior by DePaola. However, DePaola declares that he spoke to Mathena from his cell during rounds and specifically told Mathena that he needed mental health treatment and informed him of his mental health history.

### 9.  Warden Tracy Ray.

Ray was the Warden of Red Onion from 2005 until October 2011.  He responded to several disciplinary appeals and was the Warden in 2009 when DePaola stabbed a correctional officer.   He does not recall ever having any conversations about DePaola's mental health or receiving information indicating

that his mental health needs were not being met. However, DePaola says he spoke to Ray during rounds, informed him of his mental health history, and told Ray he needed treatment. On November 5, 2010, Ketron emailed Ray to inform Ray that Dr. Steward would be visiting Red Onion to evaluate DePaola's competency. Ray did not follow up with Dr. Steward after the examination or request to see his report.

### 10. Administrator Denise Malone.

Malone has been VDOC Chief of Mental Health Services since 2012 and currently holds that position. She is a licensed clinical psychologist. She gathered information about the plaintiff to respond to a level II grievance appeal.

Malone emailed Huff about DePaola's history in response to the grievance appeal. When Huff responded that DePaola had recently been assessed by a QMHP and did not display any symptoms of mental illness, Malone recommended that the appeal be deemed unfounded. She did not personally review his file or conduct any other investigation.

After this suit was filed, when Malone first saw a report by an independent psychiatric evaluator opining that DePaola's mental health needs were not being met, Malone contacted Red Onion and asked staff to check on him. DePaola thereafter spoke to a psychiatrist via video conference, though the conversation did not take place in a private room.

11. Administrator Fred Schilling.

Schilling was the Health Services Director for VDOC until he retired on January 31, 2016. He worked on the plaintiff's grievance appeal in 2015. He is not a medical practitioner. DePaola admits he never met Schilling but declares that he told Schilling through the grievance process that he was not receiving needed treatment.

## B.

The parties have submitted the reports and deposition testimony of two expert witnesses. Plaintiff's expert Terry A. Kupers, M.D., is a board-licensed psychiatrist. Dr. Kupers examined DePaola over the course of several hours on August 27, 2018. Dr. Kupers diagnosed bipolar disorder, post-traumatic stress disorder, and other conditions. He opined that DePaola's time in solitary confinement has worsened his mental health conditions. He concluded that DePaola's mental illness was obvious to anyone who spoke to him. He opined that cell-front visits are inadequate treatment for any inmate with a SMI, and that cell-front evaluations are also improper. According to Dr. Kupers, DePaola should be immediately transferred from Red Onion to protect his mental health. Dr. Kupers opined that by ignoring DePaola's serious mental health issues, the defendants have harmed him.

Dr. Kupers visited DePaola again on January 17, 2019, and administered several mental health tests. He reviewed the report written by Dr. Johnson, discussed below, and prepared an additional report, again urging immediate treatment and transfer.

Sally Ann Cunningham Johnson, M.D., is a forensic psychiatrist who conducted an independent mental examination of DePaola at the defendants' request. Dr. Johnson evaluated DePaola on October 18, 2018, and November 29-30, 2018. She also interviewed Huff, Trent, Fletcher, and Dr. McDuffie, and she administered several tests. Dr. Johnson noted there was no record of DePaola receiving any significant mental health treatment while at Red Onion. She diagnosed DePaola with major depressive disorder with anxious distress (arising during his incarceration), antisocial personality disorder, stress and trauma from long term incarceration and segregation, and attention deficit hyperactivity disorder. She concluded that his mental and physical health were at risk without immediate treatment, and she urged VDOC to develop a plan to remove DePaola from restrictive housing. She indicated that he needs to be evaluated and treated by a psychiatrist and at a minimum requires counseling and medication, among other things. She stated that his risk of suicide is chronic. She indicated that evaluations, treatment sessions, and reviews should be conducted in a confidential setting.

During her deposition, Dr. Johnson testified that cell-front visits by QMHPs are not meaningful treatment of an SMI. She also stated that monitoring is different from treatment. Defendant QMHP Fletcher testified in her deposition that Red Onion may not be able to provide all the things that Dr. Johnson recommended, particularly at DePaola's security level.

## III.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To raise a genuine issue of material fact sufficient to avoid summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting 10A Charles Alan

Wright et al., *Fed. Practice & Procedure* § 2728 (3d ed. 1998)).  The court may not assess credibility on a motion for summary judgment.  *Id.* at 569.

At the same time, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion."  *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).  Summary judgment is not a disfavored procedural shortcut, but an important mechanism for weeding out claims and defenses that have no factual basis.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  It is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.  *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

### A. *Statute of Limitations.*

Defendants Mathena, Ray, Mullins, Ketron, and Malone contend that the claims against them are time-barred because they were not named as defendants in the original Complaint, the claims against them do not relate back to the date of the original Complaint, and none of them had any involvement with DePaola within the two years before they were added as defendants.  DePaola counters that under the continuing violation theory, it is not necessary that each individual defendant did some action within the limitations period, so long as the continuing violation of DePaola's rights was ongoing within the limitations period.  DePaola also argues that the claims against these defendants relate back to the date of the original

Complaint because these defendants knew that they had interacted with DePaola regarding his mental health treatment and thus should have expected that they could be named in the lawsuit.

The Fourth Circuit held in this case that the continuing violation doctrine applied to DePaola's claims as stated in his original Complaint and that they were not time-barred. 884 F.3d at 484. The Fourth Circuit stated that "to assert a Section 1983 claim for deliberate indifference under the 'continuing violation' doctrine, a plaintiff must (1) identify a series of acts or omissions that demonstrate deliberate indifference to his serious medical need(s); and (2) place one or more of these acts or omissions within the applicable statute of limitations for personal injury." *Id.* at 487. Because DePaola had not amended his Complaint at the time of the Fourth Circuit's ruling, its opinion did not address the issue of relation back or whether claims against any as-yet-unnamed defendants would be timely.

Post-remand, DePaola amended his Complaint and added defendants Mathena, Ray, Kiser, Malone, Mullins, and Ketron on June 20, 2018. Unless the claims against them relate back to the date of the original Complaint, the two-year statute of limitations period as to these defendants would stretch back to June 20, 2016. However, Mathena, Ray, Mullins, and Ketron were no longer employed at Red Onion on that date. Accordingly, the defendants argue that the continuing violation doctrine does not save the claims against these individuals, and the claims

against them are time-barred.  In fact, Ray, Mullins, and Ketron left Red Onion in 2010 and 2011, so even if the claims against them did relate back to the date of the original Complaint, they assert that these claims are untimely because the original limitations period commenced in 2013, well after their employment at Red Onion had ended.  As to the Count I deliberate indifference claim against Malone, the defendants argue that her only act of responding to a grievance occurred in 2015, three years before she learned of this suit, so that claim is also time-barred.

Section 1983 cases adopt the statute of limitations governing general personal injury actions in the state where the tort allegedly occurred.  *Battle v. Ledford*, 912 F.3d 708, 713 (4th Cir. 2019).  In Virginia, the limitations period for general personal injury claims is two years.  Va. Code Ann. § 8.01-243(A).  Federal Rule of Civil Procedure 15(c)(1) states:

> **(1)** **_When an Amendment Relates Back._**  An amendment to a pleading relates back to the date of the original pleading when:
>
> > **(A)** the law that provides the applicable statute of limitations allows relation back;
> >
> > **(B)** the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading; or
> >
> > **(C)** the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

<table>
<tr><td>**(i)**</td><td>received such notice of the action that it will not be prejudiced in defending on the merits; and</td></tr>
<tr><td>**(ii)**</td><td>knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.</td></tr>
</table>

Rule 15(c)(1)(A) allows the court to look to Virginia state law to determine whether new claims relate back to the original Complaint. Virginia's relevant relation back statute states:

> An amendment changing the party against whom a claim is asserted, whether to correct a misnomer or otherwise, relates back to the date of the original pleading if (i) the claim asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleading, (ii) within the limitations period prescribed for commencing the action against the party to be brought in by the amendment, that party or its agent received notice of the institution of the action, (iii) that party will not be prejudiced in maintaining a defense on the merits, and (iv) that party knew or should have known that but for a mistake concerning the identity of the proper party, the action would have been brought against that party.

Va. Code Ann. § 8.01-6. The defendants concede that the first element is satisfied here.

The defendants argue that relation back cannot save DePaola's claims because the newly added parties had no actual or constructive notice in 2015, within the period allowed for service of process, that the action would have been filed against them but for a mistake of identity. *See* Fed. R. Civ. P. 15(c)(1)(C). First, the plaintiff does not contend that these defendants had been omitted from the original Complaint due to some mistake of identity. Second, Ray, Ketron,

Mullins, and Mathena were no longer working at Red Onion when this suit was filed, so they would have had no reason to know about it. Malone was working for VDOC when this suit was filed, but she did not learn of this litigation until she received the Amended Complaint filed in June of 2018.

The plaintiff responds that the actions and inactions of Ketron, Ray, Mathena, Mullins, and Malone were all part of a series of events that denied DePaola access to necessary treatment, so the continuing violation doctrine applies regardless of the fact that these defendants individually did not do anything within the limitations period. DePaola asserts that he does not have to show relation back because the violation of his rights had not yet ended when his Amended Complaint was filed and these parties were named. He further argues that even if he was required to show relation back, he could do so because any QMHP or administrator who played a role in denying him treatment should have known that he or she could be added to the claims asserted in his original pro se complaint.

DePaola has not pointed to any convincing precedent for his position that he does not have to meet the relation-back requirements for newly added defendants because the continuing violation doctrine applies. Under 42 U.S.C. § 1983, "a plaintiff must [show] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). It follows that in order to be held liable, each individual

defendant must have committed a constitutional violation within the applicable limitations period. Moreover, precedent suggests that I should strictly interpret Rule 15(c) and the relation-back requirements. *See Locklear v. Bergman & Beving AB*, 457 F.3d 363, 366–67 (4th Cir. 2006).

Turning to the requirements of the Virginia relation-back statute, DePaola's claims against these new defendants fails on the application of the second essential element. The record does not contain any evidence that "within the limitations period prescribed for commencing the action against" the new defendants, those defendants "received notice of the institution of the action." Va. Code Ann. § 8.01-6. Mathena stopped working at Red Onion in 2015. Ray has not worked at Red Onion since 2011. Mullins left employment at Red Onion in December 2010. Ketron has not worked at Red Onion since March 2011. There is no indication that any of these defendants knew about this suit within the limitations period or that they took any action related to DePaola after their employment at Red Onion ended. Nor can DePaola satisfy the fourth element of Virginia's relation-back statute, as there was no mistake of identity with respect to these defendants.

These claims similarly fail to relate back under Federal Rule of Civil Procedure 15(c)(1)(C). Rule 15(c)(1)(C)(i) requires that the defendants received notice of the suit within Rule 4(m)'s 90-day service window, and there is no indication in the record that these defendants received such notice. Rule

15(c)(1)(C)(ii) requires a "mistake concerning the proper party's identity," and no such mistake is present here. These are simply new parties that DePaola had chosen not to name in his original Complaint. Thus, for the same reasons that these claims cannot relate back under the Virginia statute, they cannot relate back under Rule 15(c)(1)(C). And, as noted above, even if DePaola could satisfy the relation-back requirements, the claims against Ray, Mullins, and Ketron would still be time-barred, as these defendants had no involvement with DePaola for more than two years prior to the filing of the original Complaint in 2015.

I find that the claims against Mathena, Ray, Mullins, Ketron, and Malone, are time barred. There is no record evidence that these defendants actually knew of this suit during the time periods required by the federal rule or state statute. Even Malone, who still works for VDOC, did not learn of the suit until the fall of 2018. The plaintiff has not produced any evidence to the contrary. Moreover, these defendants could not have known that they would have been named but for a mistake of identity of the proper party because there was no such mistake of identity. I will therefore grant the Motion for Summary Judgment based on the statute of limitations as to the claims against Mathena, Ray, Mullins, and Ketron, and as to the Count I claim against Malone.

B. *Count I.*

1. QMHP Defendants.

The QMHPs, along with the other remaining defendants, contend they are entitled to qualified immunity. A claim under 42 U.S.C. § 1983 requires proof of the following three elements: "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997). Government officials sued in their individual capacities are "persons" within the meaning of the statute, but they may be entitled to qualified immunity. *Hafer v. Melo*, 502 U.S. 21, 25, 31 (1991).

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Meyers v. Baltimore Cty.*, 713 F.3d 723, 731 (4th Cir. 2013). A defendant asserting qualified immunity has the burden of proving the defense. *Id.* Qualified immunity is immunity from suit rather than merely immunity from liability; therefore, the question of qualified immunity should be decided before trial. *Id.*

A court deciding the applicability of qualified immunity must determine not only "whether a constitutional violation occurred," but also "whether the right violated was clearly established" at the time of the events in question. *Tobey v.*

*Jones*, 706 F.3d 379, 385 (4th Cir. 2013).  This is so because "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) (citations omitted).  Courts are free to "skip ahead to the question whether the law clearly established that the [defendant's] conduct was unlawful in the circumstances of the case."  *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  A defendant cannot be said to have violated clearly established law unless "'existing precedent . . . placed the . . . constitutional question beyond debate.'"  *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  The protection of qualified immunity extends to "all but the plainly incompetent or those who knowingly violate the law."  *Raub*, 785 F.3d at 881 (citation omitted).

"A prisoner has a constitutional right to the medical care necessary to address his serious medical needs."  *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018) (unpublished).  A prison staff member's "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment."  *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  To prove deliberate indifference, DePaola must show that each defendant prison official had "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's [own] action or inaction."

*Id.* This component requires proof of intent beyond mere negligence, errors in judgment, inadvertent oversights, or disagreements between a health care professional and patient about the prisoner's treatment plan. *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) ("Questions of medical judgment are not subject to judicial review."). "[O]fficials evince deliberate indifference by acting intentionally to delay or deny the prisoner access to adequate medical care or by ignoring an inmate's known serious medical needs." *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 733 (4th Cir. 2015) (unpublished).

"Courts treat an inmate's mental health claims just as seriously as any physical health claims." *DePaola*, 884 F.3d at 486 (citing *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977)). "[T]he mere fact that prison officials provide some treatment does not mean they have provided 'constitutionally adequate treatment.'" *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 211 (4th Cir. 2017) (citation omitted). The treatment provided by a prison must "'be adequate to address the prisoner's serious medical need.'" *Id.* (citation omitted).

While the defendants concede for purposes of summary judgment that DePaola had a serious mental health need, the QMHPs assert that they lacked

personal knowledge of DePaola's need for treatment and thus could not have been deliberately indifferent to a serious risk of harm in failing to provide treatment.

Fletcher met with DePaola only once, in response to his request for services. She reviewed two informal complaints but says she saw nothing indicating he needed to be referred to a psychiatrist. Huff interacted with DePaola 14 times, but testified that he did not know that DePaola had expressed suicidal ideations or acted suicidal. When he was asked to respond to a grievance in 2015, he met with DePaola privately and performed a MMSE, but he did not provide any treatment. Huff also summarized DePaola's recent mental health visits for administrators. Trent interacted with DePaola at least 10 times and stated that he never noticed any red flags in his interactions with DePaola.

The record reveals disputes of fact as to what each of these QMHP defendants knew about DePaola's serious mental health needs. Viewing the evidence in the light most favorable to DePaola, the evidence shows that DePaola repeatedly asked for help, that his records showed his serious mental health history and attempted suicide via starvation, and that the defendants ignored his pleas and his history, instead choosing to believe that he was malingering and not actually impaired. DePaola has declared that he told each of these QMHP defendants about his mental health history and current mental health needs. Dr. Kupers has opined that DePaola's serious mental health needs would have been apparent to anyone

who spoke to him within a matter of minutes. Despite this evidence that they knew of his need for treatment, Fletcher, Huff, and Trent did not themselves provide any treatment, and they did not refer him to a psychiatrist for treatment. The expert witnesses agree that DePaola essentially received no treatment at all. I conclude that DePaola has created a genuine issue of material fact as to whether Fletcher, Huff, and Trent knew of his serious mental health need and exhibited deliberate indifference to the substantial risk posed by that need in failing to provide any mental health care.

That is not the end of the inquiry, however. The claims against these QMHPs must be assessed through the lens of qualified immunity. As is almost always the case when a defendant invokes qualified immunity, the parties disagree as to how narrowly or broadly to define the right at issue. The QMHPs assert that DePaola had no clearly established right to be referred to a psychiatrist on demand. That is certainly true, but it is an overly narrow definition of the right at issue that does not fully account for the facts of this case.

Not only was DePaola not referred to a psychiatrist, he was also denied all other available forms of mental health treatment. He was not prescribed any medication. He was not given any meaningful counseling. Instead, he was simply monitored and assessed as having little or no impairment.

The cases of *De'lonta v. Angelone*, 330 F.3d 630 (2003) (*De'lonta I*) and *De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013) (*De'lonta II*), though procedurally different, are instructive here. In *De'lonta I*, 330 F.3d at 635–36, the court of appeals reversed the district court's dismissal of an inmate's suit alleging that prison officials' denial of treatment for gender identity disorder ("GID") amounted to deliberate indifference in violation of the Eighth Amendment. The inmate had been consistently diagnosed as suffering from GID, but a VDOC policy declared that VDOC would not provide any medical or surgical treatment related to sex reassignment for inmates with GID. *Id.* at 632. Despite repeatedly requesting hormone therapy and referral to a gender specialist, the inmate was denied all treatment, leading her to self-mutilate. *Id.* The district court had concluded that the inmate's allegations merely showed a disagreement with the proper course of treatment, which would at most establish medical malpractice and could not amount to deliberate indifference under the Eighth Amendment. *Id.* at 632-33. The Fourth Circuit disagreed, however, concluding that the inmate had stated a claim of deliberate indifference. *Id.* at 634. Discussing a memo written by VDOC's Chief Physician denying referral to a specialist, the court wrote, "Dr. Marsh's memo is at most only a comment on the appropriateness of one possible treatment and does not refute De'lonta's claim that she has not received any treatment . . . ." *Id.* at 635.

The parties reached a settlement and VDOC agreed to provide the inmate treatment for GID. *De'lonta II*, 708 F.3d at 522. Despite receiving hormone therapy and psychological counseling for several years, the inmate continued to feel a strong urge to self-castrate, which she communicated to prison officials. *Id.* at 522. She was hospitalized after a self-castration attempt. *Id.* She asked to stop seeing the psychologist, as those sessions triggered her urge to self-castrate, and she requested sex reassignment surgery. *Id.* VDOC's Chief Psychiatrist denied her requests and instructed the inmate to continue working with the psychologist. *Id.* at 523. The inmate again filed suit, claiming that denial of sex reassignment surgery constituted deliberate indifference to a serious medical need. The district court dismissed the claim, concluding that prison officials had provided the inmate with treatment and had denied only her preferred treatment of surgery. *Id.* According to the district court, this dissatisfaction with the course of treatment could not support an Eighth Amendment violation. *Id.* at 523–24. The court of appeals again disagreed. *Id.* at 525. The court noted that the inmate had alleged that "despite her repeated complaints to [prison officials] alerting them to the persistence of her symptoms and the inefficacy of her existing treatment, she has never been evaluated concerning her suitability for surgery." *Id.* at 525. The court went on to state that "just because Appellees have provided De'lonta with some treatment consistent with the GID Standards of Care, it does not follow that they

have necessarily provided her with *constitutionally adequate* treatment." *Id.* at 526.

Here, as in *De'lonta I*, there is evidence that the QMHPs knew of DePaola's serious mental health need but provided no treatment for it. Even if one deems the brief cell-front monitoring visits to be mental health treatment, *De'lonta I* demonstrates that the provision of such minimal treatment does not necessarily satisfy the constitution's requirements. *De'lonta II* further establishes that an inmate's repeated pleas to mental health professionals may be sufficient to give the professionals knowledge of a serious mental health need and inadequacy of treatment. And in this case, like in *De'lonta I and II*, the Fourth Circuit held that DePaola's allegations were sufficient to state a plausible claim of deliberate indifference against Huff and Trent. *DePaola*, 884 F.3d at 488. The record created in discovery includes evidence supporting the allegations in DePaola's original pro se complaint and is sufficient to allow a jury to determine whether the QMHPs were deliberately indifferent to DePaola's serious mental health need.

When considering the applicability of qualified immunity, I am admonished that "courts must not define clearly established law at a high level of generality," but must instead "examine whether the violative nature of [a defendant's] *particular* conduct is clearly established . . . in light of the specific context of the case, not as a broad general proposition." *E.W. v. Dolgos*, 884 F.3d 172, 185 (4th

Cir. 2018) (internal quotation marks and citations omitted). Nevertheless, I "must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan*, 572 U.S. at 657.

The evidence here, viewed in the light most favorable to DePaola, shows that each of these QMHP defendants knew that DePaola had a serious mental health need and failed to provide any treatment whatsoever or to refer him to a psychiatrist, thus blocking his access to the treatment he needed. "A prisoner's right to adequate medical care and freedom from deliberate indifference to medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976 and, thus, was clearly established at the time of the events in question." *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016). The Fourth Circuit clearly established the right of prisoners to receive necessary mental health care in 1977, nearly four decades before DePaola filed suit. *Bowring*, 551 F.2d at 47-48. Specifically, the court held in *Bowring* that a prison inmate

> is entitled to psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial.

551 F.2d at 47.

While the QMHPs themselves may not have concluded that DePaola had a serious mental health need, Dr. Steward evaluated DePaola at Red Onion and determined in 2010 that DePaola needed mental health treatment. When DePaola began his VDOC incarceration in 2003, a mental health professional performed a court-ordered evaluation and concluded that DePaola required mental health treatment. It is undisputed that it had been professionally determined that DePaola had a serious mental health need that could benefit from treatment and that delaying or denying treatment could harm him. Nevertheless, Fletcher, Huff, and Trent never provided any such treatment. I find that DePaola has proffered evidence from which a jury could find that these QMHP defendants violated DePaola's clearly established right to receive mental health treatment, as set forth in *Bowring*. These QMHP defendants therefore are not entitled to qualified immunity, and I will deny the Motion for Summary Judgment as to defendants Fletcher, Huff, and Trent.

### 2. Defendant Wardens Barksdale and Kiser.

Defendants Barksdale and Kiser assert that wardens are nonmedical professionals and do not make recommendations regarding inmate mental health care, nor do they supervise the mental health staff. Thus, they contend that the record evidence would not allow a jury to find that they were deliberately indifferent to DePaola's serious mental health need.

Only Warden Barksdale received a grievance regarding DePaola's mental health needs, and he referred it to the mental health staff, who told him DePaola was being monitored and did not need additional services. According to the defendants, this was an appropriate response to the grievance and does not establish deliberate indifference, as Barksdale was entitled to rely on the professional judgment of the mental health staff. DePaola declares that he spoke to both Barksdale and Kiser during rounds and told them of his needs and history. Barksdale and Malone also testified that wardens have some responsibility for mental health procedures within their prisons.

I agree with the defendants that the evidence against Wardens Barksdale and Kiser is too slim to make out viable claims of deliberate indifference. These non-medical professionals are entitled to rely on the professional decisions of the mental health staff. Deliberate indifference is a high standard. DePaola has not met his burden of producing evidence that Barksdale or Kiser actually knew of his serious mental health need and the risk posed by a lack of treatment. I will therefore grant the Motion for Summary Judgment as to Barksdale and Kiser.

### 3. Defendant Administrators.

The summary judgment record contains little evidence regarding actions or inactions of defendants Schilling, VDOC's former Health Services Director, and Malone, VDOC's Chief of Mental Health Services. Schilling responded to a

grievance appeal by referring it to the mental health department. He then reviewed the information provided by the mental health department and determined the grievance to be unfounded. There is no evidence to suggest that this non-medical-provider knew that DePaola's serious mental health needs were not being met. He was entitled to rely on the professional judgment of the mental health practitioners.

Likewise, the Count I claim against Malone is based solely on her response to a grievance. The grievance did not contain any evidence of an unmet need for treatment. Malone is a mental health professional, but she is not based at Red Onion, so she contacted facility mental health staff to gather information. She learned that DePaola had been recently assessed by a QMHP and was receiving regular screenings. She saw nothing unusual that would have alerted her to a need for a psychiatric referral.

DePaola argues that administrators should not decide grievances without conducting an independent investigation. According to DePaola, had Schilling and Malone reviewed his records, they would have seen evidence of serious mental health needs that were not being met. But that is not the standard for deliberate indifference. DePaola must prove not that Schilling and Malone should have known of his unmet needs, but rather that they had actual knowledge.

I find that the slim record evidence as to Schilling and Malone is insufficient to hold the administrators liable. DePaola has not met his burden of proving that

Schilling and Malone were deliberately indifferent to his serious medical need.  I will therefore grant summary judgment to these defendants as to Count I.

## C. *Count II.*

Count II is asserted solely against Malone.  A version of this claim was asserted in the original pro se Complaint, and the Fourth Circuit stated in a footnote, "DePaola also alleges that certain prison policies violated his Eighth Amendment rights, which contention we conclude is plainly without merit." *DePaola*, 884 F.3d at 485 n.2.  In Count II of the Second Amended Complaint, prepared by counsel, DePaola alleges that Malone was deliberately indifferent by (1) failing to adequately train QMHPs, and (2) creating and enforcing policies that allowed unqualified QMHPs to deny him treatment, particularly because they served as the gatekeepers to the psychiatrist.

Claims based on allegedly unconstitutional policies are generally construed as official-capacity claims, which are in effect claims against the entity rather than the individual.  *See Hughes v. Blankenship*, 672 F.2d 403, 406 (4th Cir. 1982).  In their Motion for Summary Judgment, the defendants argue that DePaola has not met the high standard for proving official capacity or entity-level deliberate indifference.  They argue that the VDOC mental health policies ensure that inmates receive mental health assessments upon placement in restrictive housing and periodically thereafter; that all QMHPs have at least a master's degree in a field

related to mental health or human services; that QMHPs receive annual training; and that inmates can request mental health services when needed. VDOC policies also provide contract psychiatrists for inmates who need psychiatric care, including medication, and VDOC has mental-health housing units for inmates who require them. The defendants argue that viewing these policies as a whole, the framework put into place by VDOC for addressing inmate mental health needs does not show deliberate indifference to those needs.

DePaola points to the stark difference in opinion between the five non-prison psychiatrists and psychologists who assessed him, all of whom diagnosed serious mental health needs, and the QMHPs, all of whom noted no serious mental health needs. DePaola argues that this is evidence that the QMHPs are not adequately qualified and should not be serving as gatekeepers to the contract psychiatrists. DePaola also argues that the errors in his records show a lack of auditing and oversight by Malone, and that the mental health staff is clearly overworked to the point that they cannot provide constitutionally adequate treatment. There is evidence that approximately one-third of the inmates at Red Onion have mental health issues, and DePaola argues that there are not enough QMHPs to address these issues, nor can they be addressed by part-time psychiatrists.

Neither in the Second Amended Complaint nor in the brief in opposition to the summary judgment motion does plaintiff's counsel state whether Count II is

against Malone in her individual capacity or in her official capacity. "[W]hen a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995). Here, Count II seeks money damages as well as injunctive relief, which suggests it is an individual-capacity claim. Count II alleges that Malone personally failed to train the QMHP defendants, which points to this being an individual-capacity claim, but also alleges that Malone enforced policies and procedures that violated DePaola's rights, which suggests that this is an official-capacity claim.

If Count II asserts a claim against Malone in her official capacity, it fails because state officials sued for monetary damages in their official capacities are not "persons" under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Additionally, a claim against Malone in her official capacity is really a claim against VDOC, and a claim for damages against VDOC would be barred by the Eleventh Amendment. *See Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1138 (4th Cir. 1990) (explaining that as a general principle, "it is well settled that the Eleventh Amendment bars a suit by private parties to recover money damages from the state.").

While a plaintiff may seek prospective injunctive relief against an appropriate state defendant in her official capacity, *Frew ex rel. Frew v. Hawkins,* 540 U.S. 431, 437 (2004), even if Malone was sued in this capacity, DePaola has not shown that VDOC's policies are unconstitutional on their face or as generally applied. The evidence he offers pertains primarily to his own experiences. The fact that the QMHPs did not refer him to a psychiatrist when he needed one does not render the entire referral system unconstitutional. QMHPs are required to have a certain level of relevant education in the mental health field, and VDOC policies provide for initial and regular assessment of prisoners with mental health issues, particularly those placed in restrictive housing, with more frequent and intensive monitoring and treatment provided to those assessed with more serious illnesses. That the QMHPs in this case may have incorrectly assessed DePaola as having minimal mental health needs not requiring treatment does not mean that the policies for assessing, monitoring, and treating mental illness violate the Eighth Amendment. The lack of a formal auditing process and a heavy mental health case load are likewise inadequate bases for holding Malone liable in her official capacity. The evidence related to VDOC's mental health policies and practices does not demonstrate entity-level deliberate indifference.

To the extent that Count II asserts that Malone in her individual capacity failed to adequately train the QMHPs, "there are limited circumstances in which an

allegation of a 'failure to train' can be the basis for liability under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). However, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). The record does not contain evidence from which a reasonable jury could conclude that Malone knew that the training provided to QMHPs was inadequate and posed an unreasonable risk of constitutional injury.

If in Count II DePaola seeks to assert an individual-capacity claim of supervisory liability against Malone, he likewise fails to establish such a claim. DePaola cannot hold Malone vicariously liable under § 1983 for alleged constitutional violations by the QMHPs, her subordinates. *See Shaw*, 13 F.3d at 798. Rather, to establish supervisory liability, DePaola must show that Malone "had actual or constructive knowledge that h[er] subordinate[s were] engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury" to the plaintiff, "the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices," and "there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Randall v. Prince George's Cty.,* 302 F.3d 188, 206 (4th Cir. 2002) (internal quotation

marks and citation omitted). "A supervisor's continued inaction in the face of documented widespread abuses . . . provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984). Again, there is no evidence that Malone knew of widespread constitutional abuses by QMHPs. The evidence simply does not reveal any basis for holding Malone liable under a supervisory liability theory.

Viewing the record in the light most favorable to DePaola, there is not sufficient evidence from which relief could be awarded in Malone's official or individual capacity based on unconstitutional policies and procedures, a failure to train, or supervisory liability. Therefore, I will grant the Motion for Summary Judgment as to Count II.

IV.

For the foregoing reasons, it is hereby **ORDERED** that the Motion for Summary Judgment, ECF No. 155, is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED as to defendants Barksdale, Schilling, Mathena, Ray, Kiser, Malone, Mullins, and Ketron. The Motion is DENIED as to defendants Fletcher, Huff, and Trent.

ENTER: August 5, 2019

/s/ *James P. Jones*
United States District Judge